No. 10-3523

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

| | | |
|---|---|---|
| RICK ALEMAN, | ) | On Appeal from the United |
| | ) | States District Court for the Northern |
| Plaintiff-Appellant, | ) | District of Illinois, Eastern Division. |
| | ) | |
| v. | ) | No. 1:07-cv-05049 |
| | ) | |
| VILLAGE OF HANOVER PARK, | ) | |
| et al., | ) | The Honorable |
| | ) | ELAINE BUCKLO, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

## BRIEF OF DEFENDANTS-APPELLEES ILLINOIS STATE POLICE OFFICERS GERARD FALLON AND JOSEPH MICCI

LISA MADIGAN
Attorney General of Illinois

MICHAEL A. SCODRO
Solicitor General

100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendants-Appellees
Illinois State Police Officers Gerard
Fallon and Joseph Micci

JANE ELINOR NOTZ
Deputy Solicitor General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5058
jnotz@atg.state.il.us

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.      The District Court Properly Granted Summary Judgment
        Against Aleman On His Unlawful Interrogation Claim. . . . . . . . . . . . . . . . 22

        A.      Aleman's Unlawful Interrogation Claim Fails Because He Did
                Not Invoke His Right To Have Counsel Present During Police
                Questioning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.      Master Sergeant Micci And Officer Villanueva Are Entitled
                To Qualified Immunity On The Unlawful Interrogation
                Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        C.      Because Aleman's Custodial Statements Were Not Used
                Against Him In Court, He Cannot Sustain An Unlawful
                Interrogation Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

II.     The District Court Properly Granted Summary Judgment To The
        ISP Defendants On Aleman's False Arrest Claims. . . . . . . . . . . . . . . . . . . 38

        A.      Aleman Forfeited His Challenge To The District Court's Grant Of
                Summary Judgment On The False Arrest Claims. . . . . . . . . . . . . . . 39

        B.      The ISP Defendants Had Probable Cause To Arrest Aleman For
                Aggravated Battery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        C.      Sergeant Fallon Had Probable Cause To Arrest Aleman For
                Murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

i

D. The ISP Defendants Are Entitled To Qualified Immunity On The False Arrest Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

**TABLE OF AUTHORITIES**

**Cases:** Page(s):

*Berghuis v. Thompkins*, 130 S. Ct. 2250 (2010)........................ 24, 25, 26

*Berman v. Young*, 291 F.3d 976 (7th Cir. 2002)........................ 37

*Bevier v. Hucal*, 806 F.2d 123 (7th Cir. 1986). ..................... 41, 49, 50, 51

*Biddle v. Martin*, 992 F.2d 673 (7th Cir. 1993). ..................... 51

*Brooks v. City of Chicago*, 564 F.3d 830 (7th Cir. 2009). ..................... 40

*Bryant v. State*, 862 S.W.2d 215 (Ark. 1993). ..................... 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). ..................... 22

*Chavez v. Martinez*, 538 U.S. 760 (2003). ..................... 36

*Commonwealth v. Cryer*, 689 N.E.2d 808 (Mass. 1998)........................ 29

*Commonwealth v. Hall*, 701 A.2d 190 (Pa. 1997)........................ 29

*Cosby v. Sigler*, 435 F.3d 702 (7th Cir. 2006)........................ 27

*Davis v. United States*, 512 U.S. 452 (1994)........................ 24, 25, 31, 34

*Dexia Credit Local v. Rogan*, 629 F.3d 612 (7th Cir. 2010)........................ 36, 37

*Edwards v. Arizona*, 451 U.S. 477 (1981)........................ *passim*

*Faas v. Sears, Roebuck & Co.*, 532 F.3d 633 (7th Cir. 2008)........................ 22

*Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009)........................ 40

*Gramenos v. Jewel Cos.*, 797 F.2d 432 (7th Cir. 1986). ..................... 41

*Hanson v. Dane Cnty.*, 608 F.3d 335 (7th Cir. 2010)........................ 36

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982). ..................... 35

*Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2007)..................................... 36

*Heck v. Humphrey*, 512 U.S. 477 (1994)........................................ 37

*Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653 (7th Cir. 2005). ............ 39

*Hoeft v. Anderson*, 409 Fed. Appx. 15 (7th Cir. 2011)........................... 36

*Hughes v. Meyer*, 880 F.2d 967 (7th Cir. 1989). ................................ 51

*Humphrey v. Staszak*, 148 F.3d 719 (7th Cir. 1998). ............................ 51

*Johnson v. Manitowoc Cnty.*, 635 F.3d 331 (7th Cir. 2011).... ............... 22, 45

*Jones v. Watson*, 106 F.3d 774 (7th Cir. 1997)................................. 39

*Jones v. Union Pacific R. Co.*, 302 F.3d 735 (7th Cir. 2002)..................... 48

*Juriss v. McGowan*, 957 F.2d 345 (7th Cir. 1992)............................... 40

*Kelley v. Myler*, 149 F.3d 641 (7th Cir. 1998)......................... 41, 41-42, 48

*Kimbrough v. United States*, 552 U.S. 85 (2007)................................ 30

*Lord v. Duckworth*, 29 F.3d 1216 (7th Cir. 1994). .............................. 28

*Malley v. Briggs*, 475 U.S. 335 (1986)........................................ 35

*Marr v. State*, 759 A.2d 327 (Md. Ct. Spec. App. 2000). ........................ 29

*Mason v. Godinez*, 47 F.3d 852 (7th Cir. 1995). ............................... 41

*McBride v. Grice*, 576 F.3d 703 (7th Cir. 2009). .............................. 48

*McNeil v. Wisconsin*, 501 U.S. 171 (1991). ........................... 24, 25, 28

*Michigan v. Harvey*, 494 U.S. 344 (1990)..................................... 24

*Michigan v. Mosley*, 423 U.S. 96 (1975). .................................... 25

*Minnick v. Mississippi*, 498 U.S. 146 (1990). ............................. 31-32

*Miranda v. Arizona*, 384 U.S. 436 (1966)................................. *passim*

*Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336 (7th Cir. 1985). .............. 50, 51

*Moran v. Burbine*, 475 U.S. 412 (1986)..................................... 29

*Mucha v. Oak Brook*,
No. 10-2000, 2011 WL 489617 (7th Cir. Feb. 14, 2011)............... 40, 41

*Mustafa v. City of Chicago*, 442 F.3d 544 (7th Cir. 2006). ...................... 41

*Pasiewicz v. Lake Cnty. Forest Preserve Dist.*,
270 F.3d 520 (7th Cir. 2001) ................................. 41, 48, 50

*Pearson v. Callahan*, 129 S. Ct. 808 (2009). ................................ 35

*Reget v. City of LaCrosse*, 595 F.3d 691 (7th Cir. 2010). ..................... 5, 22

*Reynolds v. Jamison*, 488 F.3d 756 (7th Cir. 2007)...................... 45, 47-48

*Rhode Island v. Innis*, 446 U.S. 291 (1980). ............................. 32, 33

*Siliven v. Ind. Dep't of Child Svcs.*, 635 F.3d 921 (7th Cir. 2011) ............... 35

*Smith v. Illinois*, 469 U.S. 91 (1984).................................. 24, 32, 33

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006)................... 37

*Sow v. Fortville Police Dep't*, 636 F.3d 293 (7th Cir. 2011)................. *passim*

*State v. Peterson*, 472 S.E.2d 730 (N.C. 1996). ............................ 29

*Stokes v. Bd. of Educ.*, 599 F.3d 617 (7th Cir. 2010). ..................... *passim*

*United States v. Brown*, 287 F.3d 965 (10th Cir. 2002)..................... 27, 28

*United States v. Buckley*, 4 F.3d 552 (7th Cir. 1993)......................... 31

*United States v. Hendrix*, 509 F.3d 362 (7th Cir. 2007). ...................... 34

*United States v. Kane*, 726 F.2d 344 (7th Cir. 1984)......................... 30

*United States v. Lee*, 618 F.3d 667 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 24, 33-34

*United States v. McKinley*, 84 F.3d 904 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . 27

*United States v. Miller*, 450 F.3d 270 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Muick*, 167 F.3d 1162 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . 29

*United States v. Peters*, 435 F.3d 746 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . 25, 27

*United States v. Sablotny*, 21 F.3d 747 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . 29, 30

*United States v. Shabaz*, 579 F.3d 815 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . 24, 25

*United States v. Walker*, 272 F.3d 407 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . 31, 34

*United States v. Zuniga-Lazaro*, 388 F.3d 308 (7th Cir. 2004) . . . . . . . . . . . . . . . . 39

*Wheeler v. Lawson*, 539 F.3d 629 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 35

*Williams v. Jaglowski*, 269 F.3d 778 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 51

*Woods v. City of Chicago*, 234 F.3d 979 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . 41

**Constitutional Provisions:**

U.S. Const. Amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 36

## JURISDICTIONAL STATEMENT

The jurisdictional statement contained in the brief of plaintiff-appellant Rick Aleman is complete and correct.

**ISSUES PRESENTED FOR REVIEW**

1. Whether the district court's order granting summary judgment to Master Sergeant Micci and Officer Villaneuva on Aleman's unlawful interrogation claim should be affirmed because (1) Aleman's requests to call his attorney and his statements (after consulting with that attorney) that his attorney had advised him against speaking, were not an unambiguous assertion of his right to have counsel present during questioning; (2) Micci and Villaneuva are entitled to qualified immunity because a reasonable officer need not have concluded that Aleman had invoked his right to counsel; or (3) Aleman's custodial statements were not used against him in a criminal case.

2. Whether the district court's order granting summary judgment to the Illinois State Police ("ISP") defendants on Aleman's false arrest claims should be affirmed because (1) Aleman failed to challenge each ground on which the district court relied in his opening brief and thus forfeited these claims; (2) the ISP defendants had probable cause to arrest Aleman; or (3) the ISP defendants had arguable probable cause and thus are entitled to qualified immunity.

**STATEMENT OF THE CASE**

Aleman filed an amended complaint against the Village of Hanover Park; Hanover Police Officers Carol Lussky, Eric Villanueva, Todd Carlson, and John Dossey; and ISP Officers Joseph Micci, Steve Cardona, and Gerard Fallon, asserting claims arising out of a police investigation into Aleman's involvement in the death of eleven-month-old Joshua Schrik, who collapsed while in Aleman's care. Doc. 43. The district dismissed Officers Dossey and Cardona with prejudice by agreement among the parties. Doc. 88.

As relevant to this appeal, the amended complaint included counts alleging that (1) the individual defendants falsely arrested Aleman for aggravated battery, in violation of the Fourth Amendment; (2) Detective Carlson and Sergeant Fallon falsely arrested Aleman for murder, in violation of the Fourth Amendment; (3) Master Sergeant Micci and Officer Villanueva unlawfully interrogated Aleman, in violation of the U.S. Constitution; and (4) Detective Carlson and Officer Villanueva maliciously prosecuted Aleman, in violation of state law. Doc. 43 at 4-8. The amended complaint also included counts asserting violations of federal law based on defendants' purported failure to intervene (to prevent Aleman's arrest) and civil conspiracy, and violations of state law based on defendants' purported civil conspiracy and intentional infliction of emotional distress, Doc. 5-6, 8; on appeal, however, Aleman does not pursue these claims, which the district court resolved in defendants' favor. *See* Brief and Short Appendix for Plaintiff-Appellant ("Appellant's

3

Br.") at 2 ("In this appeal, Aleman only seeks review of the claims for unconstitutional interrogation, false arrest and malicious prosecution."); *accord id.* at 20.

On the parties' cross-motions for summary judgment, the district court denied Aleman's motion (which had sought summary judgment on the unlawful interrogation count only), and granted summary judgment to all defendants on all counts. Mem. Op. at 1-2.[1]

---

[1] The district court's memorandum opinion and order resolving the summary judgment motions is included as Exhibit 2 in the short appendix to the Appellant's Brief. That short appendix is not paginated, however. Accordingly, the district court's opinion will be cited as "Mem. Op. at __."

**STATEMENT OF FACTS**

**The Police Detain Aleman**

On September 9, 2005, Aleman, who was running a daycare business from his home in Hanover Park, Illinois, called 911 to report that Joshua, one of the children under his care, was having trouble breathing. Doc. 129, Ex. I, Aleman Dep., pp. 46, 67, 111-12.[2] Shortly thereafter, paramedics, and then Hanover Park police officers (including Sergeant Lussky), arrived. Doc. 129, Ex. I, Aleman Dep., pp. 118-19, 122-23; Doc. 116, Ex. 4, Lussky Dep., p. 13. Joshua was taken to a hospital by ambulance. Doc. 129, Ex. I, Aleman Dep., p. 119. On Sergeant Lussky's instruction, Hanover Park Police Detective Carlson went to the hospital to interview Joshua's treating physicians and Joshua's mother, Danielle Schrik. Doc. 116, Ex. 4, Lussky Dep., p. 80. Officers with the Hanover Park Police Department ("HPPD") also requested assistance from the ISP's Child Victimization Unit. Doc. 129, Ex. G, Micci Aff., Aff. Ex. 1, p. 1. Master Sergeant Micci, Sergeant Cardona, and Sergeant Fallon (all ISP officers assigned to the Child Victimization Unit) traveled to Hanover Park to assist the HPPD. Doc. 129, Ex. A, Micci Dep., pp. 27-28; Doc. 129, Ex. B, Fallon Dep., pp. 11, 15; Doc. 129, Ex. C, Cardona Dep., pp. 13, 22.

Sergeant Cardona subsequently went to the hospital to aid Detective Carlson with the interviews. Doc. 129, Ex. C, Cardona Dep., pp. 26, 33. Dr. Gerardo Reyes,

---

[2] In this appeal from the district court's grant of summary judgment for defendants, the facts are construed "in the light most favorable" to Aleman and "all reasonable inferences" are drawn in his favor. *Reget v. City of LaCrosse*, 595 F.3d 691, 695 (7th Cir. 2010).

who had primary responsibility for Joshua's treatment, told Sergeant Cardona and Detective Carlson that Joshua had suffered a catastrophic brain injury caused by "a violent shake" and, in addition, that "the onset of [Joshua's] symptoms would have been immediately following the traumatic event." Doc. 129, Ex. C, Cardona Dep., p. 39 & Dep. Ex. 2; Doc. 129, Ex. D, Reyes Dep., pp. 50, 55. In Dr. Reyes' opinion, Joshua "would not have been alert or functioning after the incident" that resulted in his brain injury. Doc. 129, Ex. C, Cardona Dep., Dep. Ex. 2.

Next, Sergeant Cardona and Detective Carlson interviewed Dr. Michael Seigle, an ophthalmologist who had examined Joshua's eyes. Doc. 129, Ex. C, Cardona Dep., pp. 49-50 & Dep. Ex. 4; Doc. 129, Ex. E, Seigle Dep., p. 22. Dr. Seigle stated that Joshua was suffering from retinal hemorrhages consistent with "shaken baby syndrome." Doc. 129, Ex. C., Cardona Dep., Dep. Ex. 4; Doc. 129, Ex. E, Seigle Dep., pp. 17, 22. According to Dr. Seigle, the hemorrhages appeared "fresh," by which he meant they had "just occurred." Doc. 129, Ex. C, Cardona Dep., pp. 50-51 & Dep. Ex. 4.

Finally, Sergeant Cardona and Detective Carlson interviewed Dr. Albert Hasson, who was Joshua's regular pediatrician. Doc. 129, Ex. C, Cardona Dep., pp. 51-52 & Dep. Ex. 5. Dr. Hasson stated that he had seen Joshua one day earlier, on September 8, when his mother brought him to Dr. Hasson's practice. Doc. 129, Ex. C, Cardona Dep., Dep. Ex. 5. Dr. Hasson explained that he had examined Joshua's eyes and found no problems, that Joshua was acting "normal," and that he had

6

diagnosed Joshua with a standard viral infection.  Doc. 129, Ex. C, Cardona Dep.,

Dep. Ex. 5.  Sergeant Cardona transmitted the information obtained from Joshua's

doctors to investigators at the HPPD.  Doc. 129, Ex. C, Cardona Dep., pp. 62-64.[3]

Sergeant Cardona also interviewed Joshua's mother, Danielle, who had already

been interviewed by Detective Carlson.  Doc. 129, Ex. C, Cardona Dep., pp. 58-59;

Doc. 151, Ex. 21, Carlson Dep., p. 28.  Sergeant Cardona initially considered Danielle

a suspect.  Doc. 129, Ex. C, Cardona Dep., pp. 58-59.  Danielle showed appropriate

concern for her son, however, and credibly denied having abused Joshua.  Doc. 129,

Ex. C, Cardona Dep., pp. 60-61, 64.  As a result, after the interview, Sergeant

Cardona no longer suspected Danielle.  Doc. 129, Ex. C, Cardona Dep., p. 64.

Detective Carlson also interviewed Danielle's mother, Nancy Schrik; Danielle's

boyfriend, Seth Sabel; and Seth's mother, Barbara Sabel.  Doc. 151, Ex. 21, Carlson

Dep., p. 28.  Nancy did not tell Detective Carlson that Danielle had engaged in violent

acts toward Joshua, as Nancy alleged at her 2008 deposition.  Doc. 151, Ex. 14, Nancy

Schrik Dep., pp. 27, 34, 54-55, 63.

Meanwhile, at the Aleman home, Sergeant Lussky asked Aleman, along with

his wife, to accompany her to the HPPD, and Aleman agreed.  Doc. 129, Ex. I,

Aleman Dep., p. 128.  Prior to leaving Aleman's home, Sergeant Lussky learned from

---

[3]  In the district court, Aleman disputed many of defendants' factual assertions
regarding the content of the police interviews with Joshua's doctors; as the district
court held, however, Aleman identified no evidence suggesting that Joshua's doctors
did not make the statements Sergeant Cardona attributed to them.  Mem. Op. at 6
n.5 & 17; *see also infra* pp. 45-46.

Detective Carlson that Joshua was suffering from shaken baby syndrome and had

retinal hemorrhaging. Doc. 116, Ex. 4, Lussky Dep., p. 17. Once at the HPPD, at

approximately 10:55 a.m., Sergeant Lussky placed Aleman and his wife in an

interview room equipped with audio and video recording equipment and activated the

equipment. Doc. 116, Ex. 4, Lussky Dep., pp. 21-22, 27. At approximately 11:39 a.m.,

Officer Lussky refused Aleman's request that he be allowed to leave. DVD

11:39:14-16.[4]

That same day, investigators (including Master Sergeant Micci and Sergeant

Fallon) interviewed firefighters, paramedics, and police who responded to Aleman's

911 call. These first responders stated that, on arriving at Aleman's home, they

found him standing outside and holding Joshua, who appeared lifeless, with his head

tilted backward and arms hanging down. Doc. 129, Ex. H, Fallon Aff., Aff. Ex. 4 & 5.

Joshua was not breathing, he had no pulse, and the paramedics' two attempts to

intubate him failed. Doc. 129, Ex. G, Micci Aff., Aff. Ex. 2. His condition was

upgraded from "child having difficulty breathing" to "full arrest," and he did not

regain consciousness. Doc. 129, Ex. G, Micci Aff., Aff. Ex. 2; Doc. 129, Ex. H, Fallon

Aff., Aff. Ex. 5.

---

[4] DVDs of the police recording were submitted to the district court as exhibits to the parties' cross-motions for summary judgment, but those DVDs were not made part of the record on appeal. *See* 7th Cir. Docket for *Aleman v. Hanover Park* (10-3523) at No. 8 (stating that record on appeal, as electronically transmitted, consists of four volumes of pleadings). On July 6, 2011, the ISP defendants filed an unopposed motion to supplement the record on appeal with the DVDs. That motion is pending in the district court as of the filing of this brief.

The first responders also stated that Aleman appeared distraught and nervous, was agitated and unable to calm down, and had a panicked look on his face.  Doc. 129, Ex. G, Micci Aff., Aff. Ex. 1, p. 2; Doc. 129, Ex. H, Fallon Aff., Aff. Ex. 1, p. 1 & Aff. Ex. 2, p. 1.  Aleman said at least twice that he did not want to go to jail for the rest of his life or be unable to see his children.  Doc. 129, Ex. H, Fallon Aff., Aff. Ex. 2, p. 2. And Aleman explained the events preceeding Joshua's collapse as follows:  Joshua was sick when Danielle dropped him off that morning and started crying after she left; Joshua continued to cry when Aleman placed him on a couch with a blanket and stuffed animal; Aleman unsuccessfully tried to get Joshua to interact with other children; Aleman left the room to make breakfast, stopped to check on Joshua, and found him "lifeless"; and Aleman gave Joshua a rescue breath and called 911.  Doc. 129, Ex. H, Fallon Aff., Aff. Ex. 2, pp. 1-2.

**Master Sergeant Micci and Officer Villaneuva Question Aleman**

Master Sergeant Micci was at the HPPD for several hours prior to interviewing Aleman.  Doc. 129, Ex. A, Micci Dep., p. 29.  During that time, he interviewed the first responders and spoke with several investigators, including Sergeant Cardona. Doc. 129, Ex. A, Micci Dep., pp. 59-60, 79, 168; Doc. 129, Ex. G, Micci Aff., Aff. Ex. 1 & 2; Doc. 129, Ex. H, Fallon Aff., Aff. Ex. 1 & 2.  At approximately 5:12 p.m., Master Sergeant Micci and Officer Villanueva entered the interview room.  DVD 17:12:28.

First, Master Sergeant Micci told Aleman that he would read him his rights. DVD 17:14:01-13.  The following exchange (which was recorded by the HPPD's

recording equipment) occurred:

Micci:     Before I get started. . . uh I do this for every single person I talk to so
           there's never a mistake with anybody.  And I'm sure you've heard these on
           T.V. a million times before.

Aleman:  Oh here we go.

Micci:     I know, well, this is State Police policy.

Aleman:  I know, but before I do that I gotta call my guy.  Just give me one phone
           call real quick and let me call him and tell him I'm about to do this so he
           knows.

DVD 17:14:01-22.

Next, Master Sergeant Micci filled out a *Miranda* waiver form, asking Aleman

his name and responding to Aleman's questions (regarding whether his wife had

waived her rights and called a lawyer), and authorized Aleman to call his lawyer, if

Aleman so desired.   DVD 17:14:35-15:37.  Specifically, Micci said, and Aleman

responded:

Micci:     Before I ask any questions or before you even tell me anything even if I
           don't ask you questions, ok, uh, you have the right to remain silent,
           anything you say can be used against you in court or other proceedings, you
           have the right to talk to a lawyer for advice before I ask you any questions
           and to have him with you during questioning, if you cannot afford a lawyer,
           one will be appointed for you free of any cost to you before any questioning,
           if you wish.  So, basically what this is saying is anything you . . . before I
           talk to you, I would like this [*Miranda* waiver] signed, uh, if this is not
           signed I'm not going to talk to you.  And the pros and cons of that are I
           assume you have information that would help you out and help me out as to
           what the heck happened here.  And if you talk to me, I can get that
           information.  If you don't talk to me, which I won't do, then I will go on the
           information that I've got from other sources, which I don't like to do
           because it's second hand.  So, if you want to call your attorney first that's
           fine with me.

Aleman:   Yeah.  It will just take a second.

DVD 17:16:00-16:52.

Aleman called his attorney from a telephone in the hallway outside the interview room.  DVD 17:18:30.  Aleman's side of the conversation is partially audible on the HPPD recording; the person with whom Aleman was speaking, however, was neither audible nor recorded.  DVD 17:18:30-23:29.  Aleman's attorney advised him not to give an interview without an attorney present or sign a waiver of his *Miranda* rights.  Doc. 125, Ex. 3, Ankin Decl., ¶ 3.  Aleman put Officer Villanueva, who was in the hallway (Aleman not having asked him to leave), on the phone with his attorney, and the attorney told Villanueva that he represented Aleman, who would not talk without his attorney present.  Doc. 125, Ex. 3, Ankin Decl., ¶ 4; DVD 17:21:45-22:20.  Villanueva then gave the telephone back to Aleman and, after Aleman had completed his call, instructed him to return to the interview room.  DVD 17:22:20-23:30.  Master Sergeant Micci had no knowledge of Villanueva's telephone conversation with Aleman's attorney.  Doc. 129, Ex. A, Micci Dep., pp. 52, 119-20.

Back in the interview room, the following exchange occurred:

Micci:    How we doing?

Aleman:   Not good.  I called him and he told me not to do this right now and to offer to come back tomorrow or whatever.  Said you've been there all day, you've done above and beyond and cooperated.  I told him I was tired and didn't feel real comfortable right now, you know, I honestly, I mean I was, you know, more alert and ready for this like hours ago.  I've been stressing and asking to see my wife and this and that and I've just been making myself sick.  I told him that, I didn't tell him all that, but briefly I told him that. And he said well then tell them that and tell them you'd love to come back.

11

He said a couple other things, but I'm not trying to be like you know. . . .

Micci:     I'm not trying to be the bad guy myself, but if I don't get to talk to you, you're not going home, OK?  The information I have right now is leading me to believe that something happened at that house.  After speaking with three doctors at the hospital with the information they gave me that's what I need to clear up.[5]  But if I can't speak with you about that, then you're going to be staying here.

Aleman:  I don't know.  I don't know what to do.

Micci:     So, look.  It's up to you.

Aleman:  I don't know.

Micci:     Rick, you need to make a decision.  I'm not going to sit here and bullshit you.  I want to talk to you, but if you don't want to talk to me, I'm not going to talk to you.  I'm not going to talk to you unless you sign this.  That's how it is.  I have some questions to ask you about what happened. . . .  That's the reason I want to talk to you to clear this up.  The information that other people gave me are leading me to believe one thing.  But I only have one half of the story.  That main guy, you, who was there, has all the other information.  If you don't give me other information, I can only go with what I have.  But I can guarantee this you this: If you don't talk to me and give me information that takes away from the information I have over here, you're not gonna be going home.  Uh.  So whether you're tired or not is not going to make a lot of difference right now because you're not gonna be going home.  And I'm going to have to take a different route uh than that, so you need to make a decision.  I understand you're tired.  I understand you're stressed.  I do this every day, I know exactly what you're talking about but you're the only person that can help yourself out.

DVD 17:24:59-27:36.

Aleman continued to express uncertainty and requested permission (stating,

"can I call numbnuts back?"), which was granted, to again call his attorney.  DVD

_____

[5]  Master Sergeant Micci had not himself spoken with Doctors Reyes, Seigle, and Hasson (Sergeant Cardona having relayed the information he obtained from the doctors to the investigators at the station); at his deposition, Micci described his statement as an "interrogation tactic."  Doc. 129, Ex. A, Micci Dep., pp. 85, 104-05.

17:28:56-29:21. On the recording, Aleman can be heard saying to his attorney (whose response was not recorded):

Aleman: No, I don't know. I don't know about that. I don't know. I'm not sure about that but this is, I don't want to get arrested tonight, you know. I'm stressing and I've been waiting all day and I was hoping to get the hell out of here. And now they give me an ultimatum and I don't know. I wish you were here. . . . Alright. I'm going to call my wife. I don't know, they let her go, a half hour or forty-five minutes ago or something. And they got me in this room and now they're here. . . . Nothing, not even like you said earlier, like I told them earlier. . . . Oh I will. I know. Alright. . . . Well, yeah they were making notes. Yellow pad. Legal pad. Yeah. Alright. Well, he said if I don't sign it. . . . Well, no, it's this, what he wants me to sign is a waiver of rights. And then we'll talk. Here listen: statement of institutional right and waiver. Before we ask you any questions, it is my duty to provide. . . . You know, you have the right to remain silent, blah, blah. Okay, so go ahead and tell them what happened and that's it, we're cool, right? Listen, stay alert, because I'm probably going to jail tonight and I need you. Alright. Well, no I mean, like you said, there's no bond court on Saturday, right? Alright, so it'll be Monday. What? I saved his life. I gave him CPR and all that gook came out and now he's alive now. Then why are they harassing me? They said about information. . . . No, no, well they didn't say that but I mean, of course no. I didn't. Well that's already been explained, but that was yesterday. Alright. . . . I just want to go home. I may never get out of here the way this is going. I don't know but I need your help. I know, I know, I know. But I can't help myself. You got my home number? My wife is around, I don't know. Alright, thanks.

DVD 17:32:08-37:16.

After speaking with his attorney, Aleman made several phone calls in an attempt to reach his wife. DVD 17:37:17-44:50. At this point, Officer Villanueva confirmed that Aleman had spoken with his attorney and asked him not to use the phone again "until we decide what we're gonna do." DVD 17:42:25-44:52. Aleman returned to the interview room, where this exchange took place:

Micci: OK, where are we at?

13

Aleman: Um, I, you know, I talked to a lawyer and you know, I, you know, I tried to talk him into doing it, you know, and, you know, he's telling me to go ahead, you know, he's . . .

Micci: He said to go ahead?

Aleman: Yeah, you know, I mean I really don't have a problem doing it. It's just you know he said [inaudible], so I just followed.[6]

Micci: So he said go ahead, then do it, then?

Aleman: I can do it, yeah.

DVD 17:49:08-34.

Aleman signed the *Miranda* waiver form. DVD 17:49:54-57. After signing the form, Aleman (with police permission) called his wife. DVD 17:50:00-57:25. Then, in response to police questioning, Aleman stated that when Danielle arrived with Joshua at eight o'clock that morning, Joshua "looked the same [as] the last two times I [had] seen him." DVD 18:15:35-39. Danielle stayed for approximately 15 minutes, during which Aleman observed Joshua "crying to his mom" at some point. DVD 18:16:26-30; 19:25:49-54. Because Joshua began crying again after Danielle left, Aleman carried him to the door to watch her leave. DVD 18:17:20-47. Joshua then calmed down and put his head on Aleman's shoulder. DVD 18:17:52-54. Aleman also stated that at one point during the morning, Joshua "was just looking around, not

_____

[6] In his response to defendants' statement of additional material facts, Aleman described this statement as follows: "Yeah, you know. I mean, I really don't have a problem doing it. . . . It's just you know he said no [gesturing], so I just followed." Doc. 163 ¶ 71. The district court, after reviewing the recording, described a portion of Aleman's final sentence as "inaudible." Mem. Op. at 36. As explained, this discrepancy is immaterial because only Aleman could invoke his Fifth Amendment rights. *See infra* pp. 28-29.

real familiar with his surroundings still, and not too happy." DVD 18:49:40-49.

Aleman further stated that, after discovering that Joshua, whom he had placed on the couch, was having difficultly breathing, "in a panic" he tried to revive Joshua. DVD 19:38:04-34. Aleman admitted to holding Joshua under his armpits and shaking him. DVD 19:39:41-40:33. When asked by Master Sergeant Micci how hard he shook Joshua, Aleman stated, "probably hard enough. . . . I'm ashamed of myself." DVD 19:39:35-41. Aleman also stated, "I admit it. I did shake the baby too hard. But I didn't mean to. I didn't mean any harm." DVD 20:19:09-15. Aleman demonstrated his actions by shaking a plastic baby. DVD 21:41:33-43:54.

At approximately 9:58 p.m., Master Sergeant Micci told Aleman that he was under arrest and terminated questioning. DVD 21:58:10-22. The following day, when Micci prepared to resume the interview, Aleman asked for and obtained permission to call his lawyer. DVD 10:57:12-33. After talking to his lawyer, Aleman stated that he did not want to speak with police, and Micci immediately cut off questioning. DVD 11:11:36-11:25:55.

**Aleman Is Charged With Aggravated Battery And, After Joshua Died, With Murder**

Sergeants Fallon and Lussky interviewed Carl Gutman and Adam Michalik, who had children in Aleman's care on the morning of September 9. Doc. 129, Ex. L, Michalik Dep., Dep. Ex. 2; Doc. 129, Ex. M, Gutman Dep., Dep. Ex. 2. Fallon and Lussky summarized the content of their interviews in police reports, the accuracy of which neither Gutman nor Michalik disputed, although Gutman testified at his 2008

deposition that the report regarding his interview lacked detail. Doc. 129, Ex. L, Michalik Dep., pp. 37-41; Doc. 129, Ex. M, Gutman Dep., p. 106. Michalik stated that he arrived at Aleman's home at approximately 7:55 a.m. (shortly before Danielle left), to drop off his son. Doc. 129, Ex. L, Michalik Dep., Dep. Ex. 2, p. 1. Aleman looked "frazzled" the entire time Michalik was there, and Joshua was lying on the floor, where he appeared to be watching television (although Michalik could not recall whether Joshua's eyes were open or closed). *Id.* at 2. Michalik said that when he left, no adults other than Aleman were present. *Id.* Gutman stated that when he arrived at Aleman's home at approximately 8:30 a.m., Aleman was holding Joshua, who looked sick and had a "vacant stare." Doc. 129, Ex. M, Gutman Dep., Dep. Ex. 2. After Aleman placed Joshua on the couch in a sitting position, Joshua slumped over, and Aleman tucked a blanket around him to keep him in an upright position. *Id.* Joshua continued to stare in the general direction of the television. *Id.*

On September 11, Officer Villanueva signed a criminal complaint charging Aleman with aggravated battery of a child, Doc. 116, Ex. 4, Villaneuva Dep., p. 79 & Dep. Ex. 1, and, the next day, the circuit court found probable cause to detain Aleman and set bond (which Aleman posted), Doc. 129, Ex. I, Aleman Dep., pp. 159-60, 184; Doc. 129, Ex. J, 9/12/05 Transcript, pp. 4, 8. Joshua died on September 13. Doc. 129, Ex. K, 9/15/05 Transcript, p. 7. On September 14, Detective Carlson and Officer Villanueva attended an autopsy performed by Dr. Nancy Jones, an assistant medical examiner, who diagnosed Joshua's cause of death as a subdural hematoma and blunt

16

head trauma.  Doc. 151, Ex. 21, Carlson Dep., pp. 99, 103 & Dep. Ex. 2, p. 1.  Later that day, Dr. Jones told Detective Carlson that, in her opinion, Joshua's injuries were inflicted during the morning of September 9.  Doc. 151, Ex. 21, Carlson Dep., p. 108 & Dep. Ex. 2, p. 1.  On September 15, Detective Carlson signed a criminal complaint charging Aleman with murder, and Aleman (accompanied by his attorney) turned himself in to the HPPD, where Sergeant Fallon participated in processing him.  Doc. 129, Ex. I, Aleman Dep., pp. 224-27; Doc. 151, Ex. 21, Carlson Dep., Dep. Ex. 3.  Also on September 15, the circuit court found probable cause to detain Aleman for murder and set bond.  Doc. 129, Ex. K, 9/15/05 Transcript, pp. 7, 11.  Aleman was released on bond on October 15, 2005.  Doc. 129, Ex. I, Aleman Dep., pp. 181-82.  The charges against him were dismissed on November 13, 2006.  Doc. 125, Ex. 6, Certified Disposition, p. 3.

**The District Court's Memorandum Opinion And Order.**

Aleman filed his complaint on September 7, 2007, Doc. 1, and his amended complaint on February 25, 2008, Doc. 43.  On September 29, 2010, the district court granted summary judgment to defendants on all claims.  Doc. 176.  As relevant to this appeal, the court held, first, that Sergeant Lussky had probable cause to arrest Aleman for aggravated battery at around noon on September 9 (when she denied his request to leave the police station) because she had evidence that Joshua, who was last in Aleman's custody, was exhibiting symptoms of shaken baby syndrome.  Mem. Op. at 15.  And the remaining defendants had probable cause for arrest because

Sergeant Lussky's initial probable cause determination was "bolstered" by information obtained later in the day, including "Aleman's expressions of angst about being sent to jail for the rest of his life" (which "could reasonably have been regarded as evidence of a guilty conscience") and the doctors' statements that "Joshua's injuries were 'fresh' or had happened immediately." *Id.* at 15-16. In the alternative, the court held, defendants were entitled to qualified immunity because they had "arguable" probable cause for arrest. *Id.* at 19-20.

Next, the district court held that Sergeant Fallon and Detective Carlson had probable cause to arrest Aleman for murder on September 15. Mem. Op. at 21-31. Sergeant Fallon arrested Aleman pursuant to a facially valid warrant, Fallon had no reason to suspect the warrant was issued without probable cause, and, in any event, his role in the arrest was "purely administrative or ministerial" (or, at the very least, supported by probable cause). *Id.* at 22-23. As for Detective Carlson, the court held that the question whether Carlson had probable cause for arrest was "somewhat closer," *id.* at 23, but that the doctors' statements were sufficient to support a finding of probable cause, *id.* at 26-27. In reaching this conclusion, the district court rejected (as inconsistent "with settled law") Aleman's argument that defendants had a duty to investigate further once probable cause was established. *Id.* at 28-31. Moreover, because probable cause provides an absolute defense to a malicious prosecution claim, the district court granted judgment on that claim as well. *Id.* at 43.

Finally, the district court held that Aleman "never unambiguously invoked his

18

right to counsel" and, thus, rejected his unlawful interrogation claim. Mem. Op. at 33, *see also id.* at 37-40. Although Aleman expressed a desire to speak with his attorney, Aleman did "not suggest, or even intimate, an unwillingness to answer questions without his attorney present," as the Fifth Amendment requires. *Id.* at 37-38. And because the privilege against compelled self-incrimination is a personal right, Aleman's attorney (who told Officer Villaneuva that his client would not talk) had "no authority to assert Aleman's Fifth Amendment rights." *Id.* at 39. Instead, "it was up to Aleman to decide whether he wished to make a statement." *Id.* at 39-40. As for Master Sergeant Micci, the district court held that Micci properly "refrained from asking any questions about the case until Aleman signed the *Miranda* waiver" and even "stopped Aleman on several occasions from volunteering information about the events in question until Aleman had made a clear decision about whether to waive his rights." *Id.* at 38-39.

Aleman's argument that Master Sergeant Micci and Officer Villanueva unlawfully interrogated him fails on three, independent grounds. First, the Fifth Amendment requires police to cease questioning only when a suspect invokes his right to counsel by *unambiguously* expressing a desire for his lawyer's presence. Neither Aleman's requests to speak to his attorney (which Micci and Villanueva honored) nor that attorney's recommendation that Aleman decline to speak with the police clearly expressed Aleman's desire to have counsel present during police questioning. Under the circumstances, a reasonable officer could believe that Aleman wished to consult with counsel prior to police questioning but had rejected his attorney's advice that he answer no questions at all. Second, and alternately, even if Micci and Villanueva did violate Aleman's Fifth Amendment rights, they did not violate clearly established law and thus are entitled to qualified immunity. Third, because Aleman's custodial statements were never used to his detriment "in a criminal case," U.S. Const. Amend. V, Micci and Villaneuva may not be held liable for damages.

Any one of three grounds also dooms Aleman's false arrest claims against the ISP defendants. At the threshold, Aleman did not challenge, in his opening brief, each ground on which the district court relied to enter judgment against him; accordingly, he has forfeited his false arrest claims. In any event, those claims fail on the merits, because the ISP defendants had probable cause or, at least, arguable

probable cause to arrest him for aggravated battery and, following Joshua's death, for murder.

## ARGUMENT

This Court reviews a district court's order granting summary judgment de novo. *See*, *e.g.*, *Sow v. Fortville Police Dep't*, 636 F.3d 293, 299 (7th Cir. 2011); *Reget v. City of LaCrosse*, 595 F.3d 691, 695 (7th Cir. 2010). "[S]ummary judgment is appropriate if 'the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Reget*, 595 F.3d at 695 (quoting Fed. R. Civ. P. 56); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Johnson v. Manitowoc Cnty.*, 635 F.3d 331, 334 (7th Cir. 2011) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)). When making this determination, the court construes all facts "in the light most favorable" to the nonmovant and "draw[s] all reasonable inferences in his favor." *Reget*, 595 F.3d at 695.

## I.    The District Court Properly Granted Summary Judgment Against Aleman On His Unlawful Interrogation Claim.

The Court should affirm the district court's judgment on Aleman's unlawful interrogation claim for any one of three reasons. First, the Fifth Amendment requires police to cease questioning only when a suspect invokes his right to counsel by *unambiguously* expressing a desire for his lawyer's presence. Neither Aleman's requests to speak to his attorney (which Micci and Villanueva honored) nor that

22

attorney's recommendation that Aleman decline to speak with the police was a clear expression of Aleman's wish to have counsel present during questioning. Second, even if Micci and Villanueva did violate the Fifth Amendment, they did not violate clearly established law and thus are qualifiedly immune. Third, because Aleman's custodial statements were never used to his detriment "in a criminal case," U.S. Const. Amend. V, he cannot sustain an unlawful interrogation claim.

### A. Aleman's Unlawful Interrogation Claim Fails Because He Did Not Invoke His Right To Have Counsel Present During Police Questioning.

Aleman's Fifth Amendment compelled, self-incrimination claim fails because he did not clearly and unequivocally assert his right to have counsel present prior to being questioned by Master Sergeant Micci and Officer Villanueva. And when, on the morning of September 10, Aleman *did* unambiguously invoke his right to counsel, Micci and Villanueva immediately stopped questioning him.

A suspect in police custody must be informed of his right to remain silent, that anything he says can be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). When a suspect invokes his right to have counsel present, questioning must cease until counsel has been made available, unless the suspect initiates further communication with the police. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The *Edwards* safeguard is "designed to prevent police from

23

badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

Application of the *Edwards* rule depends on whether the suspect "*actually* invoked his right to counsel." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (*per curiam*) (emphasis added). A suspect wishing to invoke the right to counsel "must do so 'unambiguously.'" *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). A statement "that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel" does not require the police to cease questioning. *Davis*, 512 U.S. at 459 (emphasis in original); *see also McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) ("the *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards*") (emphasis in original). Moreover, "[l]aw enforcement officials are not under any obligation to clarify ambiguous statements made by an accused." *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009); *see also Thompkins*, 130 S. Ct. at 2259-60. "The burden is instead on the suspect to make a 'clear and unambiguous assertion of his right to counsel to stop questioning.'" *Shabaz*, 579 F.3d at 818 (quoting *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005)).

This "requirement of an unambiguous invocation of *Miranda* rights . . . avoids difficulties of proof," "provides guidance to officers on how to proceed in the face of ambiguity," and obviates "a significant burden on society's interest in prosecuting

criminal activity." *Thompkins*, 130 S. Ct. at 2260 (internal markings omitted). "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequences of suppression 'if they guess wrong.'" *Id.* (quoting *Davis*, 512 U.S. at 461). Such a rule "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity." *Michigan v. Mosley*, 423 U.S. 96, 102 (1975).

Whether a suspect has clearly and unequivocally invoked his right to counsel is "an objective inquiry," *Thompkins*, 130 S. Ct. at 2260, that requires consideration of not only the words used but also "the context in which they were spoken," *United States v. Peters*, 435 F.3d 746, 751 (7th Cir. 2006); *see also Shabaz*, 579 F.3d at 819. Moreover, there must be "a tight fit between [a suspect's] being informed of the right and his statement allegedly invoking it." *Peters*, 435 F.3d at 751. Thus, a suspect invokes the right to have counsel present during police questioning by "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." *McNeil*, 510 U.S. at 178 (emphasis in original). Only an "assertion [that] . . . realistically constitute[s] the *expression* (as *Edwards* required) of a wish to have counsel present during custodial interrogation" qualifies. *Id.* at 179 (emphasis in original).

Here, neither Aleman's words nor the context in which they were spoken

clearly and unequivocally expressed a desire to be questioned by police only with counsel present.  At no point did Aleman tell the police that he did not want to be questioned without his attorney.  Had he made this "simple, unambiguous statement[], he would have invoked his 'right to cut off questioning.'" *Thompkins*, 130 S. Ct. at 2260 (quoting *Mosley*, 423 U.S. at 103).  Instead, Aleman equivocated and obfuscated, responding to Master Sergeant Micci's efforts to elicit his intent with a series of statements that could lead a reasonable officer to believe, first, that Aleman wished to answer police questions but, before doing so, wanted to consult with his attorney; and, second, that Aleman had rejected his attorney's advice not to submit to uncounseled police questioning.

First, as Master Sergeant Micci prepared to read Aleman his *Miranda* rights and proffer the waiver form for his signature, Aleman asked to call his "guy" and "tell him I'm about to do this so he knows."  DVD 17:14:13-21.  Based on this statement, a police officer reasonably could believe that Aleman wanted to speak to his attorney in advance of questioning, but not necessarily have his attorney present during questioning.  Indeed, that is how Micci understood Aleman's statement, *see* DVD 17:16:49-52 (Micci stating, "if you want to call your attorney first, that's fine with me")—an understanding Aleman did not disabuse him of, *see id.* (Aleman stating, "Yeah.  It will just take a second.").

The reasonableness of Master Sergeant Micci's understanding is confirmed by the context.  Before asking Aleman any questions (beyond his name), Micci advised

26

him of a panoply of rights. *See* DVD 17:16:05-22 (Micci stating, "you have the right to remain silent; . . . you have the right to talk to a lawyer for advice before I ask you questions, and to have him with you during questioning; if you cannot afford a lawyer, one will be appointed for you free of any cost to you, and before any questioning if you wish"). But Aleman expressed a desire only to talk to his lawyer *before* questioning. From the context, an officer could reasonably conclude (as Micci did) that Aleman was not invoking his *Miranda* right to counsel *during* questioning.

Nor need a reasonable officer conclude from Aleman's decision to consult with counsel that he was invoking his right to have counsel present during questioning. "[T]he simple fact" that a suspect "conferred with an attorney . . . is insufficient to constitute a statement invoking h[is] right to counsel"; there must "'be an *expression* of the suspect's wish' for counsel" to be present. *Cosby v. Sigler*, 435 F.3d 702, 707 (7th Cir. 2006) (quoting *United States v. McKinley*, 84 F.3d 904, 910 (7th Cir. 1996)) (emphasis in original). Thus, courts (including this one) have distinguished between a suspect's decision to consult with an attorney and the decision to have counsel present during questioning, holding that a request for the former is not an invocation of the right to the latter. For example, in *United States v. Brown*, 287 F.3d 965 (10th Cir. 2002) (which this Court cited with approval in *Peters*, *see* 435 F.3d at 751), the Tenth Circuit held that a suspect who answered "yes" when asked if he would answer questions without a lawyer present, but also answered "yes" when asked if he wanted a lawyer and when asked if he wanted to talk to a lawyer, did not clearly and

unequivocally invoke his right to counsel. *See Brown*, 287 F. 3d at 972-73. Similarly, in *Lord v. Duckworth*, 29 F.3d 1216 (7th Cir. 1994), this Court confirmed a state court's conclusion that a suspect's statement during questioning that "'I can't afford a lawyer but is there any way I can get one?'" reasonably could be understood as a request for counsel *at trial*, and thus did not unambiguously express a desire for counsel during custodial interrogation. *Id.* at 1218, 1221; *see also McNeil*, 501 U.S. at 175, 177 (suspect's invocation of Sixth Amendment right to counsel during judicial proceeding on charged offense was not invocation of right to counsel during custodial interrogation on distinct, uncharged offense).

Next, after speaking with his lawyer, Aleman *still* did not clearly and unequivocally express a desire to have counsel present. In response to Master Sergeant Micci's effort to clarify Aleman's wishes, *see* DVD 17:24:58-25:02 (Micci stating, "How we doing?"), Aleman stated that his attorney had advised him against speaking with police, *see* DVD 17:25:03-06 (Aleman stating, "he told me not to do this right now"), and expressed uncertainty about whether he should answer questions without counsel present, *see* DVD 17:26:19-23 (Aleman stating, "I don't know what to do"). But neither his attorney's instructions, nor Aleman's uncertainty about whether to follow those instructions, are an unambiguous invocation of the right to counsel.

As the district court recognized, the Fifth Amendment privilege is "'a personal one that can only be invoked by the individual whose testimony is being compelled.'"

Mem. Op. at 39 (quoting *Moran v. Burbine*, 475 U.S. 412, 433 n.4 (1986)). Accordingly, a suspect may waive his Fifth Amendment rights despite his attorney's advice and that attorney's instructions to police not to talk to him. For example, in *United States v. Muick*, 167 F.3d 1162 (7th Cir. 1999), this Court held a lawyer's repeated instruction to law enforcement that they not question his client without counsel present was "insufficient to invoke the *Miranda* right to counsel." *Id.* at 1166. Other courts similarly have held that the right to counsel may be invoked by the suspect only, and, accordingly, "the failure of police to follow defense counsel's instructions does not affect the validity of an otherwise valid [*Miranda*] waiver." *Marr v. State*, 759 A.2d 327, 336 (Md. Ct. Spec. App. 2000) (discussing *Bryant v. State*, 862 S.W.2d 215, 221-22 (Ark. 1993); *Commonwealth v. Cryer*, 689 N.E.2d 808, 812 (Mass. 1998); *State v. Peterson*, 472 S.E.2d 730, 733 (N.C. 1996); *Commonwealth v. Hall*, 701 A.2d 190, 197 (Pa. 1997)). Because the Fifth Amendment right is personal, that (unbeknownst to Micci) Aleman's attorney told Officer Villanueva that his client was not going to talk without his lawyer present, as well as that both Villanueva and Micci knew Aleman's lawyer had advised him against speaking with police, did not invoke Aleman's right to counsel.

Aleman's equivocating about whether to follow his lawyer's advice also was not a valid invocation of his right to counsel. Master Sergeant Micci did nothing unlawful when he informed Aleman that "other people" had provided information against him. DVD 17:26:48-53; *see United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994)

(informing accused of inculpatory evidence not coercive police conduct). Nor did Micci act improperly when he told Aleman he could "help [him]self out" and "clear this up," and said (truthfully, because there was probable cause for Aleman's arrest, *see infra* pp. 40-43) that "[i]f you don't talk to me and give me information that takes away from what I have over here, you're not going home." DVD 172707-13; *see United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006), *abrogated on other grounds*, *Kimbrough v. United States*, 552 U.S. 85, 93 n.4 (2007) (officer's statement, after reading *Miranda* rights, that suspect could choose to cooperate and maintain his freedom, or remain silent and face arrest and prosecution, not coercive where police had probable cause for arrest); *United States v. Kane*, 726 F.2d 344, 349 (7th Cir. 1984) (officer's statement that "only you can help yourself," after suspect said he did not want to go to jail, was not coercive). "[T]he police are allowed to play on a suspect's ignorance, fears and anxieties, so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible." *Sablotny*, 21 F.3d at 753.

In response to Master Sergeant Micci's frank description of his options, Aleman equivocated, *see* DVD 17:26:19-23 (Aleman stating, "I don't know. I don't know what to do."); obtained permission to call his lawyer again, *see* DVD 17:29:18-21, and, after Micci again sought to clarify Aleman's wishes, *see* DVD 17:49:08-09 (Micci stating, "where we at?"), responded affirmatively: Aleman stated that he had "tried to talk [his attorney] into doing it," had no "problem" answering

police questions, and "can do it." DVD 17:49:12-35.[7] These statements fall squarely within the realm of an ambiguous request for counsel. For example, in *United States v. Walker*, 272 F.3d 407 (7th Cir. 2001), the Court held that the suspect's statement that "'he wasn't sure whether he should talk to [law enforcement] because he was afraid he would piss his lawyer off'" was not an unambiguous request for counsel where he later told police to "'go ahead'" with questioning. *Id.* at 413-14. The same was true in *United States v. Buckley*, 4 F.3d 552 (7th Cir. 1993), where the suspect said, "'I don't know if I need an attorney,'" but, after being read his *Miranda* rights, agreed to speak with police. *Id.* at 558-59. And that also was the case in *Davis*, where the Supreme Court decided that "'Maybe I should talk to a lawyer'" was not a clear request for counsel's presence. 512 U.S. at 462. That, after Aleman's *second* conversation with his lawyer, Officer Villanueva asked him not to use the phone again "until we decide what we're gonna do," DVD 17:44:48-52, does not change this result. Not even Aleman contends that he was denied an opportunity to *consult* with counsel, no doubt because Micci and Villanueva twice authorized him to do so.

In short, Aleman needed to clearly and unequivocally inform the police that he wanted to have counsel present during questioning. His failure to do so is fatal to his Fifth Amendment claim. The cases Aleman cites do not hold otherwise. *Minnick v.*

---

[7] Aleman also told Micci that his attorney had advised him to speak with police. *See* DVD 17:49:19-21 (Aleman stating, "he's telling me to go ahead"). Shortly thereafter, Aleman made a statement he describes as a representation that his attorney had advised him *against* speaking, although the district court deemed this statement inaudible. Mem. Op. at 36. This discrepancy is immaterial: only Aleman could assert his Fifth Amendment rights. *See supra* pp. 28-29.

*Mississippi*, 498 U.S. 146 (1990), is inapposite:  the suspect there clearly expressed his desire for counsel, by telling his interrogators to "'Come back Monday when I have a lawyer' and stat[ing] 'that he would make a more complete statement then with his lawyer present.'" *Id.* at 148-49.  Similarly, in *Smith v. Illinois*, the suspect, immediately after being informed of his "right to consult with a lawyer and to have a lawyer present with you when you're being questioned," responded, "'*I'd like to do that*.'"  469 U.S. at 92 (emphasis in original).  In context, a reasonable officer would necessarily understand that the suspect wanted to consult with counsel *and* have counsel present during questioning.  Here, as explained, a reasonable officer might conclude that Aleman wished merely to consult with counsel *before* questioning.  *See supra* p. 26.  By focusing on a single statement, *see* Appellant's Br. at 24 (arguing that "Aleman's response 'Yeah.  It will just take a second,' is indistinguishable from Smith's response, 'Uh, yeah.  I'd like to do that'"), Aleman improperly ignores the context in which the words were spoken, *see supra* p. 25.  Moreover, contrary to Aleman's suggestion (at p. 24), the conclusion that his response was ambiguous does not depend on his subsequent statements.  Unlike the suspect in *Smith*, Aleman at no point clearly and unambiguously expressed a desire to have counsel present for questioning.

As for *Rhode Island v. Innis*, 446 U.S. 291 (1980), and *Edwards v. Arizona* (also cited by Aleman), neither case "concern[ed] the threshold inquiry: whether [a suspect] invoked his right to counsel in the first instance," or whether the asserted

request was ambiguous or equivocal. *Smith*, 469 U.S. at 95. *Innis* presented the question whether a suspect who volunteered incriminating information to police had been "interrogated." 491 U.S. at 298, 302-03. The Court was not asked to decide whether the suspect had invoked his right to counsel. *See id.* at 298 (noting that parties are "in agreement" that suspect "invoked his *Miranda* right to counsel"). *Edwards* similarly presented no issue regarding the suspect's invocation of his right to counsel, the state supreme court having found that his statement—"'I want an attorney before making a deal'"—was a clear expression of the suspect's "desire to deal with police only through counsel." 451 U.S. at 479, 482, 484. At issue in *Edwards* was the validity of the suspect's waiver of that right. *See id.* at 487.

Because Aleman did not invoke his right to counsel, his argument that his execution of the *Miranda* waiver form was invalid (which depends on his having invoked his counsel right, *see* Appellants' Br. at 26-27) fails. And while Aleman does not appear to argue that Master Sergeant Micci and Officer Villanueva "interrogated" him *before* he executed the *Miranda* waiver, such an argument also would fail. A suspect is interrogated for *Miranda* purposes when the police engage in "express questioning" or "words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. Nothing the police did prior to obtaining Aleman's signed waiver form qualifies. Micci asked Aleman his name, but that question did not constitute *Miranda* interrogation. *See Lee*, 618 F.3d

33

at 677-78 ("a *Miranda* violation does not occur when officers question defendant only to a limited extent for personal data . . . since these types of questions would not reasonably be expected to elicit incriminating responses").  Nor did Micci's response to Aleman's questions regarding his wife.  *See  United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) ("A police officer's response to a direct inquiry by the defendant does not constitute 'interrogation.'").  Finally, Micci's efforts to clarify whether Aleman wanted to have counsel present (asking "How we doing?" and "where are we at?" after Aleman completed his calls to his attorney) were not interrogation, either.  Although police are not *required* to seek clarification of an ambiguous request for counsel, *see supra* p. 24, they are not precluded from doing so, *see Walker*, 272 F.3d at 414 (officer "properly gave [suspect] the opportunity to clarify his comment about counsel").  Indeed, the Supreme Court has endorsed the practice. *See Davis*, 512 U.S. at 461 ("when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney").

### B. Master Sergeant Micci And Officer Villanueva Are Entitled To Qualified Immunity On The Unlawful Interrogation Claim.

Even if Master Sergeant Micci and Officer Villanueva violated the Fifth Amendment, the district court's judgment should be affirmed on the alternate ground that they are entitled to qualified immunity because their conduct was not clearly established as a constitutional violation at the time it occurred.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages

34

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In other words, the doctrine protects public officials 'who act in ways they reasonably believe to be lawful,' and thus leaves 'ample room for mistaken judgments.'" *Siliven v. Ind. Dep't of Child Svcs.*, 635 F.3d 921, 925 (7th Cir. 2011) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law"). As explained, Micci and Villanueva did not violate Aleman's Fifth Amendment rights, because, under the law available to them, a reasonable officer need not conclude that he invoked his right to have counsel present during questioning. Were this Court to hold otherwise, it would be breaking new legal ground, entitling Micci and Villanueva to qualified immunity.

### C. Because Aleman's Custodial Statements Were Not Used Against Him In Court, He Cannot Sustain An Unlawful Interrogation Claim.

Finally, even if Aleman made what Master Sergeant Micci and Officer Villaneuva should have recognized as a clear invocation of his right to have counsel present for questioning, Aleman's unlawful interrogation claim still fails because there is no evidence that his custodial statements were used to his detriment in court.

Although Aleman's amended complaint asserts that his interrogation violated

35

substantive due process, Doc. 43 ¶ 63, Aleman abandoned that claim in favor of a Fifth Amendment compelled, self-incrimination claim, Doc. 147 at 21 (urging district court to apply Fifth Amendment, and not substantive due process, analysis to interrogation claim). In his opening brief on appeal, Aleman similarly urges a Fifth Amendment violation only. *See* Appellant's Br. at 21-27 (arguing that interrogation violated *Miranda* and its progeny). Accordingly, Aleman twice forfeited any substantive due process claim. *See*, *e.g.*, *Sow*, 636 F.3d at 301 (arguments not made to district court forfeited); *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) (points not argued in opening brief on appeal forfeited).

As for the Fifth Amendment, it provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Thus, in *Chavez v. Martinez*, 538 U.S. 760 (2003), the Supreme Court held that coercive police questioning does not violate the Fifth Amendment, absent use of the resulting statements against a defendant in a criminal case. *See id.* at 766-70 (plurality op.), 777-79 (Souter, *J.*, concurring in the judgment). Following *Chavez*, this Court has held that "[i]nterrogation that yields incriminatory evidence never used in court does not support an award of damages." *Hanson v. Dane Cnty.*, 608 F.3d 335, 339 (7th Cir. 2010); *see also Hoeft v. Anderson*, 409 Fed. Appx. 15, 17 (7th Cir. 2011) ("Absent such use, there is no constitutional violation, even when the government has initiated a criminal prosecution based on the statement."). Thus, even if Master Sergeant Micci and Officer Villanueva

unlawfully interrogated Aleman, and even if that interrogation produced incriminating statements relied on when charging Aleman, no Fifth Amendment claim lies unless the statements were used to Aleman's detriment in court. *See Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007) (because § 1983 "'creates a species of tort liability,'" plaintiff "must demonstrate not only that [defendants] violated his constitutional rights, but also that the violation caused [plaintiff] injury or damages") (quoting *Heck v. Humphrey*, 512 U.S. 477, 483 (1994)); *accord Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002).

In his opening brief, Aleman does not explain how his custodial statements were used against him in court; thus, he has forfeited his unlawful interrogation claim on appeal. *See, e.g.*, *Dexia*, 629 F.3d at 625. Forfeiture aside, the only evidence of "in court" use of the custodial statements was the prosecutor's brief reference, at the probable cause hearings on the aggravated battery and murder charges, to Aleman's having admitted that he shook Joshua. Doc. 129, Ex. J, 9/12/05 Transcript, p. 4; Doc. 129, Ex. K, 9/15/05 Transcript, p. 7. But no reasonable juror could conclude that the state court relied on these fleeting references to find probable cause to indict Aleman or set his bail. *Cf. Sornberger v. City of Knoxville*, 434 F.3d 1006, 1027 (7th Cir. 2006) (§ 1983 plaintiff, whose "confession [allegedly obtained in violation of *Miranda*] was used at a preliminary hearing to find probable cause to indict, to arraign and to set her bail," stated Fifth Amendment claim). At the hearings, the prosecutor told the court that Joshua had suffered injuries consistent with shaken

baby syndrome and was most recently in Aleman's care, Doc. 129, Ex. J, 9/12/05 Transcript, pp. 3-4; Doc. 129, Ex. K, 9/15/05 Transcript, pp. 6-7; this alone established probable cause, as explained, *see infra* pp. 42-43. That the prosecution subsequently concluded that it had sufficient evidence to prosecute Aleman without the custodial statements confirms the negligible role those statements played at the probable cause hearings. *See* Doc. 125, Ex. 8, Crothers Dep., p. 167.

Because Aleman's custodial statements were used in court only fleetingly and were irrelevant to the state court's finding of probable cause to indict and set bail, Master Sergeant Micci and Officer Villanueva may not be held liable for the questioning that produced those statements.

## II. The District Court Properly Granted Summary Judgment To The ISP Defendants On Aleman's False Arrest Claims.

The district court held, as a matter of law, that the ISP defendants had probable cause to arrest Aleman for aggravated battery, or, alternately, that they are immune from liability under the doctrine of qualified immunity. Mem. Op. at 14-21. The court further held that Sergeant Fallon had probable cause to arrest Aleman for murder. *Id.* at 21-23.[8] Aleman forfeited his challenge to these holdings, which, in any event, are correct and thus should be affirmed on any of three, independent grounds.

---

[8] Aleman does not argue that Master Sergeant Micci, who was uninvolved in his murder arrest, is liable for that arrest. *See supra* p. 3.

### A. Aleman Forfeited His Challenge To The District Court's Grant Of Summary Judgment On The False Arrest Claims.

Aleman seeks reversal generally of the district court's decision granting summary judgment to the ISP defendants on his false arrest claims, but Aleman does not challenge each independent, alternative ground on which the district court relied. This failure results in forfeiture and requires affirmance of the district court's judgment. *See Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 664-65 (7th Cir. 2005) ("appellant's failure to challenge independent, alternate ground offered by district court results in waiver of challenge to alternate ground and affirmance on that basis"); *United States v. Zuniga-Lazaro*, 388 F.3d 308, 314 (7th Cir. 2004) (same); *Jones v. Union Pacific R. Co.*, 302 F.3d 735, 741 (7th Cir. 2002) (same).

The district court held that the individual defendants had probable cause to arrest Aleman for aggravated battery, Mem. Op. at 14-19, or, *in the alternative*, that they are entitled to qualified immunity, *id.* at 19-20 ("even assuming the officers lacked probable cause for Aleman's arrest, they would nonetheless be entitled to summary judgment based on the doctrine of qualified immunity"). In his opening brief, Aleman does not challenge the district court's qualified immunity holding (and thus may not do so in his reply brief, *see, e.g., Hess*, 423 F.3d at 665 ). Nor does Aleman challenge the primary basis for the district court's determination that Sergeant Fallon had probable cause to arrest Aleman for murder: the lower court held that because Sergeant Fallon arrested Aleman pursuant to a facially valid warrant, without reason to believe the warrant was issued without probable cause,

Sergeant Fallon had probable cause for arrest. Mem. Op. at 22 ("'Generally, a person arrested pursuant to a facially valid warrant cannot prevail in a § 1983 suit for false arrest; this is so even if the arrest warrant is later determined to have an inadequate factual foundation.'") (quoting *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992)); *see also Brooks v. City of Chicago*, 564 F.3d 830, 832 (7th Cir. 2009) ("The existence of an outstanding warrant supports probable cause for an arrest.").

Aleman's failure to controvert an independent basis for the district court's judgment as to his false arrest claims requires affirmance of that judgment. Forfeiture aside, the district court's grant of summary judgment to the ISP defendants on the false arrest claims should be affirmed on the merits.

### B. The ISP Defendants Had Probable Cause To Arrest Aleman For Aggravated Battery.

Probable cause is an absolute defense to a claim of wrongful arrest asserted under § 1983 against police officers. *See Sow*, 636 F.3d at 301; *Stokes v. Bd. of Educ.*, 599 F.3d 617, 622 (7th Cir. 2010). A police officer has probable cause for arrest "if, 'at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Mucha v. Oak Brook*, No. 10-2000, 2011 WL 489617, at *3 (7th Cir. Feb. 14, 2011) (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)); *accord Sow*, 636 F.3d at 301. "Probable cause requires only that a probability or substantial chance of criminal activity exists; it

does not require the existence of criminal activity to be more likely than not true." *Mucha*, 2011 WL 489617, at \*3; *see also Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) ("Contrary to what its name might suggest, probable cause demands even less than probability.") (internal quotations omitted). Moreover, "'probable cause is a function of information and exigency.'" *Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520, 525 (7th Cir. 2001) (quoting *Bevier v. Hucal*, 806 F.2d 123, 127 (7th Cir. 1986)). Thus, the "amount of information the police are required to gather before establishing probable cause for arrest is in inverse proportion to the gravity of the crime and the threat of its imminent repetition." *Mason v. Godinez*, 47 F.3d 852, 856 (7th Cir. 1995).

"A court evaluates probable cause not with the benefit of hindsight, and not on the facts as perceived by an omniscient observer, but on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect." *Stokes*, 599 F.3d at 622; *accord Mucha*, 2011 WL 489617, at \*3; *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). And "[w]hen an officer receives information from a third party whom it seems reasonable to believe is telling the truth, the officer has probable cause to effectuate an arrest." *Sow*, 636 F.3d at 302; *accord Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998). "'[P]robable cause does not depend on the [third party] turning out to have been right; it is what the police know, not whether they know the truth, that matters.'" *Sow*, 636 F.3d at 302 (quoting *Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986)); *accord Kelley*,

149 F.2d at 647. Finally, the probable cause inquiry lends itself to resolution on summary judgment: "the court may decide whether probable cause existed if the facts material to the probable cause determination are not in dispute." *Stokes*, 599 F.3d at 623.

Even when all genuine factual disputes are resolved in Aleman's favor, the ISP defendants had probable cause to arrest him for aggravated battery, as the district court held. Aleman concedes that the ISP defendants played no role in his seizure until, respectively, Master Sergeant Micci spoke with Aleman for the first time at shortly after 5:00 p.m. on September 9, and Sergeant Fallon completed an arrest report on September 10 listing himself as an arresting officer. *See* Appellant's Br. at 28, 33. At that time, Micci and Fallon had credible information that Joshua was injured while in Aleman's care.

First, Joshua's treating physicians diagnosed Joshua as suffering from a catastrophic brain injury caused by "a violent shake," Doc. 129, Ex. C, Cardona Dep., Dep. Ex. 2 (Dr. Reyes), and identified retinal hemorrhages consistent with "shaken baby syndrome," Doc. 129, Ex. C, Cardona Dep., Dep. Ex. 4 (Dr. Seigle). Dr. Seigle opined that the hemorrhages looked "fresh," by which he meant they had "just occurred," Doc. 129 Ex. C, Cardona Dep., pp. 50-51 & Ex. 4, and Dr. Reyes agreed that "the onset of [Joshua's] symptoms would have been immediately following the traumatic event" and he "would not have been alert or functioning after the incident," Doc. 129, Ex. C, Cardona Dep., Dep. Ex. 2. These opinions were bolstered

42

by Dr. Hasson's recollection that, as recently as the previous day, there were no problems with Joshua's eyes, Joshua was acting "normal," and he had diagnosed Joshua with a standard viral infection. Doc. 129, Ex. C, Cardona Dep., Dep. Ex. 5. Next, the first responders reported that Joshua was conscious when Danielle dropped him off (Aleman having described Joshua as crying to his mom) but unconscious when they arrived; and that Aleman appeared distraught and nervous, was agitated and unable to calm down, had a panicked look on his face, and twice stated that he did not want to go to jail for the rest of his life or be unable to see his children. Doc. 129, Ex. G, Micci Aff., Aff. Ex. 1, p. 2; Doc. 129, Ex. H, Fallon Aff., Aff. Ex. 1, p. 1 & Aff. Ex. 2, pp. 1-2. Finally, Danielle showed appropriate concern for her son and credibly denied abusing Joshua. Doc. 129, Ex. C, Cardona Dep., pp. 60-61, 64.

Based on this evidence, obtained from reliable sources, a reasonable officer could believe Joshua's injuries were inflicted at Aleman's home that morning (and not several days earlier, during the Labor Day weekend, as Aleman theorizes, *see* Appellant's Br. at 4), and, moreover, that Aleman was exhibiting signs of guilt. Shaking a baby is a serious crime, and an officer in Micci's or Fallon's situation reasonably might suspect that Aleman had abused Joshua, and also conclude that prompt action was necessary to prevent Aleman, a daycare provider and father of young children, from abusing again. Aleman's claim that, if the Court finds probable cause for arrest under the circumstances presented, "any parent whose child is injured and receives medical attention could be arrested," *id.* at 32-33, ignores the

quantity and quality of evidence against him.

Nevertheless, in Aleman's view, this evidence does not support a finding of probable cause because (1) Aleman demonstrated "appropriate" concern for Joshua on finding him nonresponsive; (2) information that Joshua had been feverish and sleepy earlier in the week should have tipped off defendants that his brain injury occurred days earlier; and (3) at their 2008 depositions, Joshua's treating physicians testified that lethargy, irritability, and loss of appetite may be symptoms of shaken baby syndrome and declined to opine that Joshua's injuries had occurred on September 9. *See id.* at 29-33. The district court properly rejected each of these arguments. Mem. Op. at 16-18.

First, a reasonable officer need not conclude that Aleman's efforts to revive Joshua were sincere, nor would such a conclusion be inconsistent with a belief that Aleman was guilty: A reasonable officer could believe that Aleman was desperate to save Joshua's life because he had injured Joshua and "did not want to go to jail for the rest of his life" (the fear Aleman himself voiced). In addition, contrary to Aleman's claim, *see* Appellant's Br. 29, 31, when describing Joshua's symptoms, neither the first responders nor Danielle identified the feverishness, lethargy, and loss of appetite Joshua had displayed as "symptoms of brain injury." And a reasonable officer, when informed of these symptoms, could believe, as Joshua's pediatrician did, that he was recovering from a "standard viral infection." Doc. 129, Ex. C, Cardona Dep., Dep. Ex. 5.

44

Finally, information revealed at the 2008 depositions is irrelevant to Aleman's claims, which focus on what defendants knew at the time of his arrest. *See Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) ("The fact that an officer later discovers additional evidence unknown to her at the time of arrest, even if it tends to negate probable cause, is irrelevant—we only care about what the officer knew at the time the decision was made."). Aleman identified no evidence suggesting that Joshua's doctors did not tell police that Joshua's injuries appeared to be "fresh" and of a nature that would have manifested "immediately." Thus, Aleman's dispute with defendants' factual recitation does not preclude summary judgment (as the district court held, Mem. Op. at 6 n.5 & 17). *See Johnson*, 635 F.3d at 334 ("A genuine issue of material fact [precluding summary judgment] arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.") (internal quotations omitted).

For example, although by the time of his 2008 deposition, Dr. Reyes did not recall having spoken with Sergeant Cardona or Detective Carlson, specifically, and declined to fix the time of Joshua's injury as immediately prior to the time Joshua became nonresponsive, Dr. Reyes also stated that he had no reason to believe that Sergeant Cardona misdescribed their interview. Doc. 129, Ex. D, Reyes Dep., pp. 81-82; *see also* Doc. 149 ¶ 14 (Aleman's acknowledgment that "Dr. Reyes did not dispute the accuracy of any statement in Cardona's report other than the location of the hemorrhages"). Dr. Seigle similarly did not doubt the accuracy of Sergeant

Cardona's report; indeed, at his deposition, Dr. Seigle opined that Joshua was injured within 24 hours prior to hospitalization. Doc. 129, Ex. E, Seigle Dep., p. 42. And Dr. Hasson also confirmed the accuracy of Sergeant Cardona's report describing their interview. Doc. 129, Ex. F, Hasson Dep., pp. 34-38. Defendants were entitled to rely on what Joshua's doctors said at the time; that the doctors subsequently qualified some of their earlier statements is irrelevant to probable cause.

The same is true of evidence that Danielle may have been Joshua's abuser (although she was not charged with any crime). *See* Appellant's Br. at 3-5. Although Danielle's mother, Nancy, alleged at her 2008 deposition that she had seen Danielle engage in violent acts toward Joshua, Nancy also admitted that she did not make these claims when Detective Carlson interviewed her at the hospital on September 9, 2005. Doc. 151, Ex. 14, Nancy Schrik Dep., pp. 27, 34, 54-55, 63; *see also id.* at 77 (Nancy Schrik's statement that she told police she suspected Danielle of abusing Joshua only after charges against Aleman were dismissed). Because Nancy's allegations were unknown to defendants on September 9, they are irrelevant to probable cause.

### C. Sergeant Fallon Had Probable Cause To Arrest Aleman For Murder.

In his response to the ISP defendants' motion for summary judgment, "Aleman d[id] not dispute that Fallon arrested him pursuant to a warrant." Mem. Op. at 22 n.10. In light of Aleman's forfeiture, *see, e.g.*, *Sow*, 636 F.3d at 301 (arguments not made to district court are forfeited), the district court properly held

46

that the existence of a warrant, the validity of which Fallon had no reason to doubt, provided Fallon with probable cause for arrest. *See supra* p. 40.

And, either alone or in conjunction with a warrant, Sergeant Fallon had probable cause to arrest Aleman for murder based on evidence that: (1) Joshua was a victim of shaken baby syndrome; (2) Joshua was in Aleman's care at the time he collapsed; (3) Joshua was crying (and thus conscious) when his mother dropped him off; (4) Joshua's injuries, according to his doctors, were "fresh" and would have onset "immediately" after he was shaken; (5) Aleman reacted guiltily to Joshua's collapse (or so a reasonable person might believe); (6) Joshua's mother, a natural suspect, had credibly denied abusing Joshua; (7) Aleman admitted to having shaken Joshua (albeit in an attempt to "revive" him), DVD 19:39:35-40:33, 20:19:09-15, 21:41:33-43:54 ; and (8) Dr. Jones opined that Joshua's injuries occurred during the morning of September 9, Doc. 151, Ex. 21, Carlson Dep., p. 108 & Dep. Ex. 2, p. 1.

Aleman's arguments do not establish otherwise. First, Aleman asserts that Dr. Jones, the medical examiner, would not have implicated him had Detective Carlson not provided her with "false information." Appellant's Br. at 33. But Sergeant Fallon did not interact with Dr. Jones and there is no evidence that Sergeant Fallon knew about the content of Detective Carlson's interactions with her. Thus, even if there were evidence that Detective Carlson ignored information that would have undermined probable cause (and there is not), Detective Carlson's alleged actions—unknown to Sergeant Fallon—cannot be imputed to him. *See Reynolds*, 488

F.3d at 765 (when evaluating probable cause, "we only care about what the officers knew at the time the decision was made").

Second, contrary to Aleman's claim, Sergeant Fallon had no duty to interview (or, in some cases, re-interview) "doctors and other adults that had contact with Joshua," Appellant's Br. at 34, prior to arresting Aleman. "[O]nce police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Jones v. Watson*, 106 F.3d 774, 781 (7th Cir. 1997); *see also Stokes*, 599 F.3d at 624 ("the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation"). Rather, "[a]n officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation, but once an officer has established probable cause, he may end his investigation.'" *Sow*, 636 F.3d at 302 (quoting *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009)). The inquiry, in short, "is whether an officer has reasonable grounds on which to act, not whether it is reasonable to conduct further investigation." *Kelley*, 149 F.3d at 647. Defendants' investigation (which included interviews with Joshua's doctors, the first responders, Joshua's family, Aleman, Gutman, and Michalik) produced sufficient evidence to establish probable cause for Aleman's arrest. That brought Sergeant Fallon's constitutional duty to an end. *See Pasiewicz*, 270 F.3d at 525 ("Although the officers might have saved a law-abiding citizen considerable tumult by asking more

questions or digging deeper into the case, the Fourth Amendment did not require them to do so.").

*BeVier v. Hucal*, on which Aleman relies, *see* Appellant's Br. at 34-36, does not suggest a contrary rule. There, the plaintiffs were arrested and charged with child neglect, a crime requiring the accused to act "knowingly or willfully." *BeVier*, 806 F.2d at 126. Even so, the arresting officer, who saw the plaintiffs' sunburnt and dirty children sitting outside on a hot day, did not question the babysitter watching the children or the parents about the children's condition. *See id.* at 126-27. He simply arrested the father when he appeared as the children were taken away and arrested the mother when she arrived at the police station. *See id.* at 125. This Court held that the officer did not have probable cause for arrest, because he lacked information that the plaintiffs had intentionally neglected their children. *See id.* at 128. Worse, the evidence indicated otherwise: the officer knew that the plaintiffs were caring for their children (by taking one, who was suffering from severe diaper rash, to the hospital and hiring a competent babysitter). *See id.* at 126-27. On these facts, the Court held that "[r]easonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place." *Id.* at 128.

*BeVier* is distinguishable from this case in three ways. First, "[a] police officer's probable cause determination depends on the elements of the applicable statute," *Stokes*, 599 F.3d at 622; the arresting officer in *BeVier*, however, lacked probable cause to believe that one statutory element—intent—was present, *see Sow*,

49

636 F.3d at 302-02 (distinguishing *BeVier* because, in instant case, "there was no reason for any uncertainty regarding whether a crime had taken place"); *Pasiewicz*, 270 F.3d at 525 (same). Aleman argues that "Defendants in this case lacked any evidence on the intent element of the crime," Appellant's Br. at 35 n.2 (noting Aleman's "steadfast . . . assertions that he only shook Joshua in an effort to revive him"), but Aleman is incorrect: given the evidence that Joshua had been injured while in Aleman's care (either alone or in combination with Aleman's seemingly guilty statements to the first responders), an officer in Fallon's circumstances could reasonably believe that Aleman was lying to protect himself. Second, police "need a greater quantum of evidence when making arrests for less serious crimes." *Pasiewicz*, 270 F.3d at 525; *see also supra* p. 41. Murder is a far more serious crime than the non-life-threatening child neglect alleged in *BeVier*. Finally, the police here interviewed numerous witnesses prior to arresting Aleman. This is a far cry from *BeVier*, where the officer conducted no investigation *at all*, making arrests without asking questions of readily available witnesses.

*Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336 (7th Cir. 1985), which Aleman also cites (at p. 34), is similarly distinguishable. The plaintiffs there were arrested when a restaurant owner complained to the police after they had refused to pay the check. *See Moore*, 754 F.2d at 1340. The police arrived at the plaintiffs' home and arrested them once they acknowledged having been at the restaurant that evening. *See id.* The Court held that the police were not entitled to summary

50

judgment, having failed to ask the plaintiffs more than a single question (whether they were at the restaurant on that particular night) and thus to elicit information that would have revealed that they had a legitimate basis to dispute the bill. *See id.* at 1345-46. Thus, in *Moore* (as in *BeVier*) (1) it was doubtful that a crime had been committed, (2) any crime was a minor offense, and (3) police undertook no investigation *at all* prior to making arrests. This case, for the reasons described, is inapposite.

Finally, Aleman overstates Sergeant Fallon's involvement in his arrest (which consisted of interviewing the first responders, Gutman, and Michalik, and processing Aleman when he turned himself in), by accusing Sergeant Fallon of seeking to "evade liability for his significant role." Appellant's Br. at 36. In any event, whether Fallon's actions qualify as "significant" is beside the point: there was ample evidence establishing probable cause, and Fallon had no constitutional duty to investigate further.

### D. The ISP Defendants Are Entitled To Qualified Immunity On The False Arrest Claims.

Qualified immunity provides "an 'additional layer of protection against civil liability' if a reviewing court finds that [the police] did not have probable cause" for arrest. *Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001) (quoting *Hughes v. Meyer*, 880 F.2d 967, 970 (7th Cir. 1989)). The police are immune from damages if a "'reasonable officer could have mistakenly believed that probable cause existed,'" that is, if there was "'arguable probable cause.'" *Williams*, 269 F.3d at 781 (quoting

51

*Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)); *see also Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir. 1993) ("if a case involves a question of whether or not probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is *any* reasonable basis to conclude that probable cause existed") (internal markings omitted).

The question whether there was probable cause to arrest Aleman for aggravated battery—based on evidence that Joshua suffered injuries consistent with shaken baby syndrome, those injuries likely onset immediately after he was shaken, Joshua was in Aleman's care prior to collapsing, Aleman reacted guiltily to the first responders, and Danielle credibly denied abusing Joshua—is, at the very least, a close one. So, too, is the question whether the evidence implicating Aleman, either alone or in combination with a facially valid arrest warrant, gave Sergeant Fallon probable cause to arrest him for murder. If this Court were to conclude that the ISP defendants lacked probable cause to arrest Aleman for aggravated battery, or that Sergeant Fallon lacked probable cause to arrest for murder, the Court should hold that these defendants are entitled to qualified immunity.

**CONCLUSION**

For the foregoing reasons, Illinois State Police Officers Gerard Micci and Joseph Fallon respectfully request that this Court affirm the judgment of the district court.

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

MICHAEL A. SCODRO
Solicitor General


 /s/ Jane Elinor Notz
JANE ELINOR NOTZ
Deputy Solicitor General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5058
jnotz@atg.state.il.us

Attorneys for Defendants-Appellees
Illinois State Police Officers Gerard Fallon
and Joseph Micci

July 11, 2011

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, and TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using WordPerfect 11.0, in 12-point Century Schoolbook BT font, and complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because the brief contains, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), 13,661 words of text.

_/s/ Jane Elinor Notz_
JANE ELINOR NOTZ
Deputy Solicitor General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5058
jnotz@atg.state.il.us

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2011, I electronically filed the foregoing with the Clerk of the Court for United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

s/ *Jane Elinor Notz*
Jane Elinor Notz
jnotz@atg.state.il.us